**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 501, AFL–CIO, Respondent.**

No. 85–7517.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 5, 1986.

Decided Dec. 29, 1986.

Jerry Wohlgemuth, Christian Schuman, N.L.R.B., Washington, D.C., for petitioner.

Vicky Barker, Gordon K. Hubel, Los Angeles, Cal., for respondent.

* Honorable James M. Burns, Chief United States District Judge for the District of Oregon, sitting by designation.

Before TANG and BRUNETTI, Circuit Judges, and BURNS,* District Judge.

TANG, Circuit Judge:

The NLRB petitions for enforcement of its order that the International Union of Operating Engineers Local 501 ("Union"), violated Section 8(b)(1)(B) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(B) (1982), by fining one supervisor-member and expelling two others as discipline for continuing to perform their usual supervisory duties during a lock-out. The Union contends that the supervisor-members were doing bargaining unit work, that expulsion of members does not violate Section 8(b)(1)(B) because it does not affect the employer in its selection of collective bargaining representatives, and that an order of reinstatement violates the Union membership's first amendment right of association.

## BACKGROUND

The MGM Grand Hotel, Inc. employed approximately 42 operating engineers in its Las Vegas hotel and casino to maintain and operate hotel equipment, including air conditioning, heating, boiler room, electrical and refrigeration equipment. The operating engineers were represented by the International Union of Operating Engineers Local 501.

The collective bargaining agreement between MGM and the Union expired on April 1, 1983. MGM locked out the engineers from May 15 to June 1, 1983 and the Union established a picket line during that period. During the lock-out, the chief engineer, John Fairclough, and two assistant chief engineers, Bill Hunter and John Bucholtz, continued to perform their supervisory duties as directed by MGM. The Union charged and tried all three for violating the Union's constitution by working behind the picket line. The Union expelled Hunter

and Bucholtz from Union membership and fined Fairclough $1,000.

On June 29, 1984, the NLRB issued a complaint that the Union's discipline of the supervisor-members violated Section 8(b)(1)(B) of the NLRA. After a hearing, the ALJ found, on March 12, 1985, that the Union had committed an unfair labor practice ("ULP"), based on his determination that the chief and assistant chief engineers performed supervisory functions only, and not bargaining unit or rank-and-file work during the lock-out. The NLRB affirmed the ALJ's findings and conclusions and adopted his recommended Order on June 21, 1985.

## DISCUSSION

■ An NLRB order will be enforced if the Board's findings are supported by substantial evidence and if the Board correctly applied the law. *NLRB v. IBEW Local 46*, 793 F.2d 1026, 1028 (9th Cir.1986). The NLRB's interpretation of the NLRA is entitled to deference and this court will uphold it if it is reasonably defensible. *Id.* However, we will not rubber-stamp administrative decisions which are inconsistent with the statute or which frustrate its underlying policy. *Id.* (citing *NLRB v. IBEW Local 952*, 758 F.2d 436, 439 (9th Cir.1985)).

The analysis of a Section 8(b)(1)(B) violation charged on the basis of union discipline of supervisor-members proceeds as follows:

(1) Are the disciplined members supervisors?

(2) If so, were they performing more than *de minimus* rank-and-file work? (If so, there is no ULP.)

(3) If not, did the sanctions indirectly restrain or coerce the employer?

In this case, the Union concedes that the members are supervisors within the meaning of Section 2(11) of the NLRA and that they are representatives of MGM for purposes of collective bargaining within the meaning of Section 8(b)(1)(B). The questions at issue, then, are whether these members performed rank-and-file work during the lock-out, and even if they did not, whether the sanctions had the effect of indirectly restraining or coercing the employer's selection of bargaining representatives.

## I. Did the supervisors perform bargaining unit work?

The Board found that Fairclough, Hunter and Bucholtz performed only supervisory duties during the lock-out. Ordinarily the question of what duties were performed requires a factual determination by the Board of the nature and quantity of work performed by supervisor members. *See, e.g., Florida Power & Light Co. v. IBEW Local 641*, 417 U.S. 790, 805, 94 S.Ct. 2737, 2745, 41 L.Ed.2d 477 (1974) *("FP & L")*. This, however, is not a case in which the Union argues that the supervisor-members crossed the picket line to perform rank-and-file work during the lock-out as was contended in *FP & L*. *Id.* at 796, 94 S.Ct. at 2740. Rather, the Union argues that the supervisor-members always performed rank-and-file work, *i.e.*, that they did nothing different during the lock-out.

The Union makes two essentially legal arguments that the work the supervisors did during the lock-out was necessarily bargaining unit work. One argument is that the chief and assistant chief engineers perform some duties identical to those of the senior watch engineers, who are bargaining unit employees, and thus the chief and assistant chief engineers' duties are bargaining unit duties. The ALJ noted the overlap in duties but concluded those duties of the watch engineers, which are the same as the duties of the chief and assistant chief engineers, are not bargaining unit work. He concluded that in practice, the distinguishing feature of bargaining unit work is use of the tools of the trade. The watch engineers work with tools, the chief and assistant chief engineers do not.

■ No factual evidence was offered that Fairclough, Bucholtz and Hunter actually performed bargaining unit work according to the ALJ's definition. At the trial by the Union on the charges, the three members were merely found guilty of being in the MGM facility during the lock-out.

The ALJ's interpretation of the practice on the job is supported by substantial evidence as all three supervisors testified at the hearing that they did not normally work with tools while watch engineers did, and that during the lock-out they were told by MGM management officials to perform their supervisory duties and not to touch any tools.

The Union relies exclusively upon the contract description of the senior watch engineers' duties (Article 16.02(b)), and the logical inference that since the chief and assistant chief engineers do some of the same tasks, they must necessarily be viewed as performing bargaining unit work at all times. While this is a logical interpretation, so is that of the Board, and we sustain the Board's interpretation.

The Union's second argument that the supervisors did bargaining unit work is that because they were members of the bargaining unit, any work they did was, by definition, bargaining unit work. The Union is essentially arguing that the Union cannot violate Section 8(b)(1)(B) by disciplining a member and that if employers want to command the undivided loyalty of their supervisors they can forbid them to belong to unions. It urges that when, as here, an employer permits supervisory personnel to be Union members, it must accept the reality that those supervisor-members must demonstrate loyalty to the Union or face discipline. This is a legitimate and reasonable view of the balance of interests anticipated by the NLRA. *See FP & L*, 417 U.S. at 807–13, 94 S.Ct. at 2746–49 (Congress' solution to the problem of conflicting loyalties of supervisors was to give the employer the option of insisting that they not participate in a labor union. *Id.* at 812, 94 S.Ct. at 2748).

■ The weight of authority since *FP & L*, however, supports the Board's view that there are some situations in which sanctions against supervisor-members may violate Section 8(b)(1)(B). *See American Broadcasting Companies, Inc. v. Writers Guild*, 437 U.S. 411, 98 S.Ct. 2423, 57 L.Ed.2d 313 (1978) ("*ABC*"). A union can-

not insulate itself from such an ULP charge through the semantic argument advanced here. The *ABC* Court found that members of a union, who would benefit from a union-negotiated contract, could perform strictly supervisory functions which would not be viewed as bargaining unit work merely because they were members of the bargaining unit.

## II. Did the sanctions coerce or restrain the employer in the selection of its representatives?

The Union points out that the Board made no findings on the effect of the Union discipline, and argues that it therefore failed to meet the requirement of *ABC*, 437 U.S. at 430, 98 S.Ct. at 2434, that the Board must "inquire whether the sanction may adversely affect the supervisor's performance of his collective-bargaining or grievance-adjustment tasks and thereby coerce or restrain the employer contrary to § 8(b)(1)(B)." We disagree.

The ALJ found and the Board affirmed that the three supervisor-members were representatives of their employer for collective-bargaining and grievance-adjustment purposes within the meaning of Section 8(b)(1)(B). The ALJ also found that these supervisors performed only supervisory duties during the lock-out which did not materially differ from their regular routine, and that the Union expelled these supervisors merely because they were found in the employer's facility during the lock-out. The Board has consistently held that discipline of a supervisor constitutes a restraint or coercion of the employer within the meaning of Section 8(b)(1)(B). *See, e.g., Operating Engineers Local Union 501 (Peterson Manufacturing Co.)*, 269 NLRB 685, 687 (1984); *Local 28, Bricklayers & Allied Craftsmen (Sal Masonry Contractors, Inc.)*, 265 NLRB 744, 746–47 (1982); *Columbia Typographical Union No. 101 (The Washington Post Co.)*, 242 NLRB 1079, 1080 (1979).

■ In this case we hold that the Board, in reviewing and adopting the ALJ's find-

ings and order, made sufficient inquiry, under *ABC,* into whether the sanction affected the supervisor-members in a manner that coerced or restrained the employer in violation of Section 8(b)(1)(B). *See NLRB v. International Union of Operating Engineers Local 501,* 580 F.2d 359, 360 (9th Cir.1978) (per curiam) (discipline of a supervisor-member performing only supervisory work is an ULP under Section 8(b)(1)(B)).

█ The Union also argues that the sanction of expulsion cannot, as a matter of law, restrain or coerce an employer in selection of bargaining representatives because an ex-union member is not subject to union influence in any way. This argument has logical force but little legal support because the cases do not differentiate among various types of sanctions. In *ABC* the Court considered an argument that the adverse effects of union sanctions could be avoided by resignation from the union. 437 U.S. at 436–37, 98 S.Ct. at 2437–38. It noted that the logical end of this argument would mean that "sanctioning supervisor-members for the manner in which they perform their grievance-adjusting function ... would never be a violation because the supervisor could, at the employer's request, escape from union threats and sanctions." *Id.* at 437, 98 S.Ct. at 2438. The Supreme Court was unwilling to accept a view so contrary to the Board's construction of the Act. Likewise, we are in no position to override the Board's view that a union-ordered expulsion does no more to alleviate the impermissibly coercive effects of the sanction than would an employer-ordered resignation.

### III. Does the reinstatement order violate first amendment rights of Union members?

The Union contends that forced reinstatement of the expelled members will force Union members to associate with persons expelled "for thwarting the basic foundation of the Union itself." It argues

that such forced association violates first amendment freedom of association because the right to define the constituent membership of a group is central to the freedom. *See, e.g., Democratic Party v. Wisconsin,* 450 U.S. 107, 122, 101 S.Ct. 1010, 1019, 67 L.Ed.2d 82 (1981). In the labor-management context the Supreme Court has indicated that the test for first amendment violations requires a balancing of the interests served by the restriction on associational freedom and by the absence of restriction. *NLRB v. Associated General Contractors,* 633 F.2d 766, 772 n. 9 (9th Cir.1980) (citing *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969)), *cert. denied,* 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981).

Reinstatement is the routine Board remedy in ULP cases based on union expulsion of supervisor-members. *See, e.g., Peterson Manufacturing Co.,* 269 NLRB at 689. The Board uses this remedy "because where a union has been found guilty of violating Section 8(b)(1)(B) by expelling a supervisor-member it is obvious that the only meaningful remedy is to restore the status quo ante by ordering the union to rescind its illegal action." *Id.* The routine use of the remedy does not, however, answer the question of its constitutionality.

The Union thinks the significant first amendment freedom essential to the integrity of the union is sacrificed without any perceived furtherance of the legitimate policy concerns served by Section 8(b)(1)(B). The Board argues that reinstatement serves the fundamental policy of Section 8(b)(1)(B) of assuring supervisor loyalty to management with only the minimal impact on freedom of association of precluding the unjust expulsion of members originally included in the union.[1]

█ We conclude the balance of interest test tips in favor of this remedy because the general associational freedom protected

---

1. In so stating it, the Board has misstated the policy rationale of § 8(b)(1)(B). *See FP & L,*

417 U.S. at 811–13, 94 S.Ct. at 2747–49.

by the first amendment is subject to the limitations necessary to effectuate the policy of the NLRA. *See, e.g., Railway Employes' Department v. Hanson,* 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956) (Union shop agreement requiring financial support of a collective bargaining agency by all who received the benefits of bargaining does not violate the first amendment.); *Railway Mail Association v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945) (Union may be prohibited by state law from denying membership on the basis of race without infringing on constitutional rights of members to exercise selection of members.); *York County Fire Fighters Association v. York County,* 589 F.2d 775, 778 (4th Cir.1978) (County may prohibit supervisors from belonging to a union and "a first amendment right to associate may be validly limited where the limitation is necessary to a substantial and legitimate state interest.").

The Petition for Enforcement is GRANTED.