NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 73, SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION and Sheet Metal Workers' International Association, AFL–CIO, Respondents.

No. 86–2484.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1987.

Decided Feb. 22, 1988.

Elaine Patrick, Susan Williams and Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Donald W. Fisher, Donald W. Fisher Co., L.P.A., Toledo, Ohio, for respondents.

Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

The National Labor Relations Board (the "Board" or the "NLRB") petitions for enforcement of its order prohibiting the respondent labor unions from restraining their members from resigning in anticipation, or during the pendency, of charges of union misconduct. The larger question before us is whether section 8(b)(1)(A) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(b)(1)(A), is reasonably construed by the NLRB as prohibiting a union from imposing *any* restrictions on the rights of its members to resign. We hold that the NLRB's construction of section 8(b)(1)(A) is reasonable and, accordingly, we enforce the Board's order.

## I.

Local 73, Sheet Metal Workers' International Association ("Local 73") is affiliated with Sheet Metal Workers' International Association, AFL–CIO (the "International") and is bound by the International constitution. At all material times the International constitution has provided that "[n]o resignation [from the union] shall be accepted if offered in anticipation of charges being preferred against [the member], during the pendency of such charges or during a strike or lockout."[1] Local 73 is the exclusive collective bargaining representative of

all production and maintenance employees of Safe Air, Inc. ("Safe Air"), a manufacturer of fire and smoke dampers. Safe Air filed charges against Local 73 and the International (the "Unions") in February and March 1984, and the General Counsel of the NLRB issued a complaint against the Unions in March 1984, alleging that the restrictions on resignation in the International constitution violated section 8(b)(1)(A) of the Act by coercing and restraining union member-employees in the exercise of their rights guaranteed in section 7 of the Act.[2] The parties agreed to transfer the case directly to the NLRB, without a prior hearing by an administrative law judge, and they briefed the case on the basis of the General Counsel's contention that the mere maintenance of the restriction on resignation in the International constitution was an unfair labor practice.

The NLRB found that the Unions' maintenance of the relevant portion of the constitution restrained and coerced members in violation of section 8(b)(1)(A).[3] The Board relied primarily on its earlier decision in *International Ass'n of Machinists & Aerospace Workers, Local Lodge 1414 (Neufeld Porsche–Audi)*, 270 N.L.R.B. 1330 (1984), in which it had ruled invalid *any* restriction on a member's right to resign from a union. *Id.* at 1333–36. The NLRB therefore ordered the Unions to expunge the unlawful language from the International constitution and to cease and desist from the unfair labor practice.

1. International Constitution and Ritual art. 16, § 13, *reprinted in* Respondents' App. at 16 (Joint Stipulation of Facts). This provision was amended at the International's Thirty–Seventh General Convention in August of 1986. The relevant portion of article 16, section 13 now reads: "No resignation shall be accepted if offered in anticipation of charges being preferred against [the member], during the pendency of any such charges or, in Canada, during a strike or lockout."

2. Section 7 of the Act provides:
    Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the

right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
    29 U.S.C. § 157.

3. Section 8(b)(1)(A), which implements the general statement of rights contained in section 7, states:
    It shall be an unfair labor practice for a labor organization or its agents—
    (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein....
    29 U.S.C. § 158(b)(1)(A).

The Unions have refused to comply with that portion of the Board's order that requires them to expunge from the International constitution the provision prohibiting the resignation of employees who face disciplinary proceedings.[4] In its petition for enforcement, the NLRB argues that the Supreme Court, in *Pattern Makers' League v. NLRB*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985), endorsed and ratified the essential elements of the Board's rationale in *Neufeld*, and thus confirmed the NLRB's holding in *Neufeld* and here. The Unions challenge the NLRB's expansive reading of *Pattern Makers'*. They claim that *Pattern Makers'* merely invalidated restrictions on resignation during strikes and lockouts and left the legitimacy of other resignation restrictions unresolved. The Unions argue that the Board's construction of section 8(b)(1)(A) in *Neufeld* and in the instant case is unreasonable.

## II.

The question before the NLRB in *Neufeld* was whether a union violated section 8(b)(1)(A) by disciplining an employee for post-resignation conduct in a situation where the union's rules barred resignations. The union's constitution declared that resignations tendered during a strike or lockout were ineffective. An employee who returned to work during a strike after attempting to resign his union membership was fined $2,250 by the union. *Neufeld*, 270 N.L.R.B. at 1331.

The Board found that the specific restraints in the union constitution violated section 8(b)(1)(A), and the Board went on to hold that "any restrictions placed by a union on its members' right to resign similarly are unlawful." 270 N.L.R.B. at 1333.[5] The NLRB analyzed resignation restrictions under a three-part balancing test propounded by the Supreme Court in *Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). A union rule is valid under the *Scofield* test if it "reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." *Scofield*, 394 U.S. at 430, 89 S.Ct. at 1158.

The NLRB concluded that resignation restrictions founder on at least two prongs of this test. With respect to the "fundamental labor policy" prong of *Scofield*, the NLRB made several findings. First, it found that resignation restrictions restrain members in the exercise of their section 7 rights to refrain from any and all concerted activities. These rights, according to the Board, "encompass[ ] not only the right to refrain from strikes but also the right to refrain from union membership." *Neufeld*, 270 N.L.R.B. at 1333. Second, the NLRB found that by compelling a member to maintain full union membership, resignation restrictions collide with the statutory policy of voluntary unionism implicit in sections 8(a)(3)[6] and 8(b)(2)[7] of the Act. 270

---

**4.** The Unions do not contest the Board's finding that they violated section 8(b)(1)(A) by maintaining the constitutional provision prohibiting resignations during a strike or lockout. Indeed the Unions assert that they have voluntarily complied with this part of the Board's order. Accordingly, we summarily order enforcement of that portion of the Board's order.

**5.** The NLRB has reaffirmed this holding in several post-*Neufeld* cases. *See, e.g., Communication Workers, Local 9201 (Pacific Northwest Bell)*, 275 N.L.R.B. 1529 (1985); *Newspaper Guild of New York, Local 31 (New York Times)*, 272 N.L.R.B. 338 (1984); *International Ass'n of Machinists & Aerospace Workers, Local Lodge 1769 (Dorsey Trailers, Inc.)*, 271 N.L.R.B. 911 (1984).

**6.** Section 8(a)(3) of the Act provides in relevant part:

[N]othing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein ...: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization ... if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership....

29 U.S.C. § 158(a)(3).

**7.** Section 8(b)(2) of the Act complements section 8(a)(3) by providing in pertinent part:

It shall be an unfair labor practice for a labor organization or its agents—

N.L.R.B. at 1333. Third, the NLRB found that resignation restrictions undermine the policy aims that prompted the Supreme Court to distinguish between "internal" and "external" union actions. As long as the discipline imposed by a union meets the definition of an "internal" action, it does not constitute "restraint or coercion" within the meaning of section 8(b)(1)(A). *See Scofield,* 394 U.S. at 428, 89 S.Ct. at 1157; *NLRB v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 195, 87 S.Ct. 2001, 2014, 18 L.Ed.2d 1123 (1967).[8] The Board believed that restrictions on resignation would "artificially expand the definition of internal actions," enabling unions to continue to regulate conduct over which they would otherwise have no control. *Neufeld,* 270 N.L.R.B. at 1333. In a similar vein, the NLRB found that resignation restrictions cannot be justified under the proviso to section 8(b)(1)(A), which safeguards a union's right to prescribe its own rules about acquiring and retaining members. According to the Board,

> while a union can enact and enforce [membership] rules that are internal in scope and target, it possesses no statutory authority to impose its will on employees who exercise their section 7 right to resign and thereby refrain from concerted activity. For at that juncture, any action the union takes against the resigned employee is, by definition, "external," unless the provision is read as authority for a union unilaterally to shift the line of demarcation between internal and external actions.

270 N.L.R.B. at 1335.

With respect to the first part of the *Scofield* test, the NLRB acknowledged that

the union rule at issue in *Neufeld* plainly advanced legitimate union interests. The Board noted two such interests: maintaining strike solidarity and protecting the interests of employees who desire to continue a strike. 270 N.L.R.B. at 1333. However, the NLRB deemed it "inappropriate" to equate the "institutional interests" of a union with the statutory rights of employees: "regardless of their legitimacy, the union's interests simply cannot negate or otherwise overcome fundamental Section 7 rights." 270 N.L.R.B. at 1334.

And finally, with reference to the *Scofield* requirement that a union rule must be "reasonably enforced against union members who are free to leave the union and escape the rule," the Board believed it to be self-evident that this principle is violated by a rule that tells members that they are not, in fact, free to leave the union. *Id.*

The issue in *Pattern Makers'* and in *Neufeld* was identical: Is a union precluded from fining employees who attempt to resign during a strike when such resignations are prohibited by the union constitution? The Supreme Court approved the NLRB's conclusion that the union was so precluded and that union members have a right to resign during a strike or when a strike is imminent. *Pattern Makers',* 473 U.S. at 104–07, 105 S.Ct. at 3070–71. Noting that resignation restrictions of any type were "uncommon, if not unknown" in 1947 when Congress amended section 7 and passed section 8(b)(1) as part of the Taft–Hartley Act, the Court concluded that the purpose of the Taft–Hartley Congress to

---

    . . . .
    (2) to cause or attempt to cause an employer to discriminate against an employee ... with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership....
29 U.S.C. § 158(b)(2).

**8.** In *Allis–Chalmers,* the Supreme Court analyzed the legislative history of several interrelated provisions of the Act, and concluded that Congress intended to insulate "internal" union actions from the proscriptions of section

8(b)(1). *Allis–Chalmers,* 388 U.S. at 185–95, 87 S.Ct. at 2009–14. "Internal" union actions are described by the *Scofield* Court as those taken against full members pursuant to a duly adopted and non-arbitrary rule aimed at achieving a legitimate union end. *Scofield,* 394 U.S. at 428, 89 S.Ct. at 1157. "External" actions, on the other hand, are not exempt from section 8(b)(1)(A)'s proscriptions. External actions include those taken against a member's employment status, *id.,* and those taken against non-members or employees outside the bargaining unit. *Allis–Chalmers,* 388 U.S. at 190 & n. 25, 87 S.Ct. at 2011 & n. 25.

preserve unions' control over their own internal affairs "does not suggest an intent to authorize restrictions on the right to resign." 473 U.S. at 102, 105 S.Ct. at 3069 (citing *Neufeld*, 270 N.L.R.B. at 1333). The Court also accepted the Board's judgment in *Neufeld* that union rules prohibiting resignations compel members to maintain full union membership, and thus may be incompatible with the statutory policy of voluntary unionism. *Pattern Makers'*, 473 U.S. at 104–07, 105 S.Ct. at 3070–71. Finally, the Court did not accept the union's contention that its actions were necessarily protected by the proviso to section 8(b)(1)(A). The Court held that the phrase "rules with respect to the ... retention of membership" traditionally has been understood to refer to rules that provide for the expulsion of employees from the union, not to those that restrain the right of members to resign, *id.* at 108–09, 105 S.Ct. at 3072, and the Court thus found the NLRB's construction of the proviso reasonable.

The Unions contend that *Pattern Makers'* does not settle the question whether resignation restrictions other than those forbidding resignations during a strike or lockout may be maintained consistent with section 8(b)(1)(A). The Unions have some basis for questioning the scope of the *Pattern Makers'* holding. The Court's opinion is at times couched in broad language. *See, e.g.*, 473 U.S. at 101, 105 S.Ct. at 3068 ("We decide today whether a union is precluded from fining employees who have attempted to resign when resignations are prohibited by the union's constitution."). In a footnote, the Court explains somewhat provocatively that, prior to *Pattern Makers'*, it had "explicitly left open the question of the 'extent to which contractual restrictions on a member's right to resign may be limited by the Act.'" *Id.* at 101 n. 9, 105 S.Ct. at 3068 n. 9 (citations omitted). And later, the majority opinion recites without qualification that in *Neufeld*, "a majority of the Board held that *any* restriction on the right to resign violates the Act." *Id.* at 103 n. 13, 105 S.Ct. at 3069 (emphasis original in *Neufeld*). However, the majority in *Pattern Makers'* never seems itself to have explicitly adopted such a broad rule. And

the Court, of course, cautioned repeatedly that it was according the Board substantial deference in construing the Act and was deciding only whether the NLRB's construction was reasonable. *See, e.g., id.* at 100, 105 S.Ct. at 3067 ("The question for decision today is thus narrowed to whether the Board's construction of § 8(b)(1)(A) is reasonable."); *id.* at 116, 105 S.Ct. at 3076 (White, J., concurring) ("the Board's construction of §§ 7 and 8(b)(1)(A) is a permissible one and should be upheld").

Apparently, the Justices themselves do not entirely agree about the scope of *Pattern Makers'*. Recently, the Court revisited its *Pattern Makers'* holding in *NLRB v. International Bhd. of Elec. Workers, Local 340*, —— U.S. ——, 107 S.Ct. 2002, 95 L.Ed.2d 557 (1987). The *Electrical Workers* majority stated in dicta that *Pattern Makers'* held "that union members have a right to resign from a union *at any time* and avoid imposition of union discipline." *Id.*, 107 S.Ct. at 2015 (emphasis in original). Justice White, however, who provided the determinative fifth vote in *Pattern Makers'*, contended in his *Electrical Workers* dissent that *Pattern Makers'* held only that union members have a right to resign during a strike or when a strike is imminent. *Id.* at 2019 (White, J., dissenting). Thus, there may be some room for debate about the precise scope and effect of the *Pattern Makers'* holding.

Whatever the exact scope of *Pattern Makers'*, however, we cannot accept the Unions' implication that *Pattern Makers'* is irrelevant to the instant case, or that the reasoning of the Court there bears no resemblance to that of the Board in *Neufeld*. In fact, as noted above, both *Neufeld* and *Pattern Makers'* held that resignation restrictions restrain and coerce union members in the exercise of their section 7 rights and conflict with the statutory policy of voluntary unionism. Both the Supreme Court and the NLRB held that resignation restrictions are not included in the class of union regulations that Congress exempted from the proscriptions of section 8(b)(1)(A). We therefore agree with the Board that *Pattern Makers'* is supportive of the

Board's reasoning in *Neufeld* and in the present case.

## III.

The Unions specifically advance three arguments to justify their restrictions on the rights of members to resign in anticipation, or during the pendency, of charges of misconduct. First, the Unions contend that holding members to membership obligations that they voluntarily incurred does not constitute "restraint or coercion" in violation of section 8(b)(1)(A). Second, the Unions argue that their power to discipline miscreant members is compromised if the Unions cannot prevent resignations. Third, the Unions contend that both the common law of associations and the legislative history of the Taft–Hartley Act support their view that the regulation at issue here is a permissible one.

### A.

The Unions first claim that, because their members have freely assumed the membership obligations embodied in the International constitution, holding them to those obligations does not constitute "restraint or coercion" in violation of section 8(b)(1)(A). The Unions correctly point out that under section 8(a)(3) of the Act employees cannot be compelled to become full members of a labor organization as a condition of their employment. Arguing from this principle of voluntary unionism, the Unions assert, in essence, that it is a contradiction in terms to say that an employee-member is restrained or coerced by a condition he willingly accepted.

The Unions' argument is premised on the proposition that the union-member relationship is appropriately analyzed by analogy to the law of contract. We note in passing that courts and scholars have questioned the appropriateness of common-law contract principles in this context.[9] We need not join this debate, however, because *Pattern Makers'* clearly accepted the proposition that a union member *can* be coerced and restrained by a condition voluntarily accepted when compliance with that condition would interfere with the employee-member's exercise of his section 7 rights. 473 U.S. at 107, 105 S.Ct. at 3071. Here, as in *Pattern Makers'*, the right affected by union regulation is the right to resign. "The employee's rights under § 7 include, among others, the right to refrain from joining or assisting a labor organization and from engaging in concerted activities.... The right to join or not to join a labor organization includes the right to resign...." *Pattern Makers'*, 473 U.S. at 116, 105 S.Ct. at 3076 (White, J. concurring). Elsewhere the Court has stated that "the vitality of § 7 requires that the member be free to refrain in November from the actions he endorsed in May." *NLRB v. Granite State Joint Bd., Textile Workers Union of America, Local 1029*, 409 U.S. 213, 217–18, 93 S.Ct. 385, 387, 34 L.Ed.2d 422 (1972).

The *Pattern Makers'* majority specifically held that union restraints on the right to resign could be viewed as inconsistent with the policy of voluntary unionism embodied in section 8(a)(3). According to the Court, section 8(a)(3) protects the employment rights of employees by "allowing employees to resign from a union at any time." *Pattern Makers'*, 473 U.S. at 106, 105 S.Ct. at 3071. No doubt the Unions have a significant and legitimate interest in holding their members accountable for their membership obligations. However, following the lead of *Pattern Makers'* and acknowledging the deference due the Board's construction of the Act, we must accept the NLRB's conclusion that the Unions' rule barring the resignations of members who resign in anticipation, or during the pendency, of charges of union misconduct re-

---

9. *See, e.g., Pattern Makers'*, 473 U.S. at 113 n. 26, 105 S.Ct. at 3075; *see also* Cox, *The Legal Nature of Collective Bargaining Agreements*, 57 Mich.L. Rev. 1, 5–25 (1958); Summers, *Legal Limitation On Union Discipline*, 64 Harv.L.Rev. 1049 (1951); Note, *Justice Brennan And Union Discipline Under The NLRA: The Fight For Solidarity Impinges On Individual Rights*, 20 J. Marshall L.Rev. 127, 142–43 (1986). *But cf. Pattern Makers'*, 473 U.S. at 126–27, 105 S.Ct. at 3081–82 (Blackmun, J., dissenting).

strains and coerces such members in the exercise of their section 7 rights.

### B.

The Unions next contend that they will be stripped of their power to discipline miscreant members if they are not permitted to prevent such members from resigning. As noted, we believe that the Unions' interest in preserving their ability to discipline members who are guilty of union misconduct is a legitimate one. However, we are not persuaded that invalidation of the Unions' rule forbidding the resignations of offending members will dilute the Unions' authority in this regard. The NLRB on several occasions has upheld union efforts to discipline former members for their preresignation misconduct. *See, e.g., Newspaper Guild of New York, Local 31 (New York Times)*, 272 N.L.R.B. 338 (1984) (the NLRB upheld discipline imposed on former members when the union had instituted disciplinary proceedings some three months after the last of the members had tendered his resignation); *see also Communication Workers of America, Local 9201 (Pacific Northwest Bell)*, 275 N.L.R.B. 1529 (1985); *Engineers & Scientists Guild (Lockheed California)*, 268 N.L.R.B. 311 (1983). The Unions' reliance on *Granite State* is misplaced. *Granite State* did not address the question whether a union could discipline former members for preresignation misconduct. The Court merely held that, when a member resigns, his former union can no longer compel him to follow its rules and policies. *Granite State*, 409 U.S. at 217, 93 S.Ct. at 387.

Nor do we believe that invalidation of the resignation restriction here will diminish the vitality of the Unions' most potent sanctions—expulsion and suspension for cause. The primary effect of these sanctions, of course, is that the offending member is forced to leave his union; in this respect, expulsion and suspension, on the one hand, and resignation, on the other, seem merely to put the member in the same position. The International constitution also imposes secondary penalties against expelled and suspended members; these sanctions condition such members' reinstatement to union membership upon their performance of certain acts.[10] The NLRB, with "special competence" in the field of labor relations, *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975), held that labor unions may discipline former members for their preresignation misconduct. We can discern no reason why the Unions may not impose their secondary sanctions upon members who resign before the commencement of lawful union disciplinary proceedings. Of course, this discipline can only be imposed for the members' preresignation misconduct.[11]

In light of these circumstances assuring that unions are not stripped of their power to discipline members, we believe the Board's interpretation of the Act merits our deference.

### C.

The Unions next contend that both the common law of associations and the legislative history of the Act demonstrate that the Board's interpretation of the Act is unreasonable. The Unions first argue that, because voluntary associations were permitted at common law to prescribe rules regulating the withdrawal of members, these rules do not violate section 8(b)(1)(A) of the

---

**10.** Under article 16, section 11(b) of the International constitution, members who are suspended for cause or expelled cannot be reinstated to union membership until they (1) apply for re-initiation, (2) pay in full all financial obligations (including unpaid fines assessed in prior disciplinary proceedings) and (3) obtain the written consent of the local union from which they were expelled.

**11.** The Unions' resignation regulation is not a rule regarding the expulsion of members. Ac-

cordingly, we do not believe that the Unions can find any support for their argument in the *Pattern Makers'* Court's determination that rules providing for the expulsion of members are exempted from the proscriptions of section 8(b)(1)(A). We might draw a different conclusion if we were persuaded that invalidation of the Unions' restriction would undermine their power to expel, but, as we have explained, we do not believe this would be a likely outcome.

Act. An identical argument was rejected by the Court in *Pattern Makers'*. The Court held that union rules that are valid under the common law of associations can run afoul of section 8(b)(1)(A) and considerations of public policy. *Pattern Makers'*, 473 U.S. at 112–14, 105 S.Ct. at 3074–75. The NLRB reasonably concluded that the Unions' restriction on resignations restrains and coerces members in violation of section 8(b)(1)(A) and impairs the statutory policy of voluntary unionism. We think that the NLRB's construction of the Act is reasonable, notwithstanding the common-law rule.

The Unions also argue that the legislative history of the Taft–Hartley Act indicates that Congress made a considered decision not to protect union members' right to resign. Once again, a similar argument was considered and rejected by the Court in *Pattern Makers'*:

Section 8(c) of the House bill contained a detailed "bill of rights" for labor union members. H.R. 3020, § 8(c), 80th Cong., 1st Sess., 22–26 (1947). Included was a provision making it an unfair labor practice to "deny to any [union] member the right to resign from the organization at any time." H.R. 3020, *supra,* § 8(c)(4), at 23. The Senate bill, on the other hand, did not set forth specific employee rights, but stated more generally that it was an unfair labor practice to "restrain or coerce" employees in the exercise of their § 7 rights. H.R. 3020, 80th Cong., 1st Sess., § 8(b)(1)(A), p. 81 (1947) (as passed by Senate). The Taft–Hartley Act contains the Senate bill's general language rather than the more specific House prohibitions. See 29 U.S.C. § 158(b)(1)(A). The petitioners contend that the omission of the House provision shows that Congress expressly decided not to protect the "right to resign."

473 U.S. at 110, 105 S.Ct. at 3073.

The right to resign was included in the original House bill to protect workers unable to resign because of closed shop agreements. *See* H.R.Rep. No. 245, 80th Cong., 1st Sess. (1947). Because the Taft–Hartley Congress outlawed closed shop agreements by enacting section 8(a)(3) of the Act, the *Pattern Makers'* Court believed it "not surprising that Congress thought it unnecessary explicitly to preserve the right to resign." 473 U.S. at 111, 105 S.Ct. at 3073.

The final version of the Taft–Hartley Act was also modified to eliminate a reference in section 8(b)(1) of H.R. 3020 to an employee's right "to become or remain" a member of a labor organization. H.R. 3020, 80th Cong., 1st Sess., § 8(b)(1), at 21–22 (1947). The Unions assert that the modification to section 8(b)(1) and the elimination of section 8(a)(3) in the final version of the Taft–Hartley Act "militate" against the NLRB's conclusion that Congress intended to create a statutory right to resign from union membership. We do not agree. *Pattern Makers'* deemed the legislative history of the Act "ambiguous." 473 U.S. at 112, 105 S.Ct. at 3074. The inconclusive historical evidence upon which the Unions rely seems to us, as it did to the Supreme Court in *Pattern Makers'*, to fall short of showing that the NLRB's interpretation of the Act is unreasonable. *Id.*

## IV.

The limited role of the federal courts in the administration of the Act is well established. We cannot substitute our labor relations judgment for that of the Board. *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). The Board has reasonably concluded that the Unions' resignation restriction in article 16, section 13 of the International constitution violates section 8(b)(1)(A) of the Act. Although the Supreme Court was required in *Pattern Makers'* only to rule on the lawfulness of a union rule prohibiting resignations during a strike or lockout, the Court's rationale in that case clearly supports as reasonable the Board's construction of the Act in this one.

ORDER ENFORCED.