**E. Dean RASMUSSEN, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 88–7071.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 16, 1989.

Decided May 24, 1989.

Gregory E. Smith, Smith & Kotchka, Las Vegas, Nev., for petitioner.

Robert F. Mace, N.L.R.B., Washington, D.C., for respondent.

Before CHOY, SNEED and NOONAN, Circuit Judges.

SNEED, Circuit Judge:

Rasmussen filed a complaint with the National Labor Relations Board (NLRB) alleging that his union local committed an unfair labor practice by fining him for crossing an authorized picket line. The Board dismissed Rasmussen's complaint and he appeals. We grant enforcement of the Board's order in part and vacate the Board's order in part.

## I.

### FACTS AND PROCEEDINGS BELOW

Rasmussen is employed as the Chief Engineer at the Golden Nugget Hotel and Casino in Las Vegas, Nevada. He is also a member of Local 501 of the International Union of Operating Engineers (the Union). On May 4, 1983, after the expiration of the labor agreement between the Union and the Golden Nugget, the Union declared a strike. Sixteen nonsupervising engineers joined the strike; Rasmussen did not.[1] The hotel continued to operate during the strike. The striking engineers, who were responsible for all electrical and plumbing repair work in the hotel, were replaced by

---

1. Rasmussen supervised a total of fifty-five employees, including painters, laborers, and carpenters.

untrained laborers. Rasmussen initially trained these employees in extensive lectures, but he admitted that their qualifications and performance were less than satisfactory. After these training sessions, Rasmussen sometimes accompanied the replacements on maintenance calls in the hotel, observed the repairs, and on occasion "talked" the replacements through the job. These types of duties differed markedly from Rasmussen's duties before the strike. Previously, Rasmussen's duties were primarily administrative; he rarely went on maintenance calls.

On November 28, 1984, the Union held disciplinary proceedings against Rasmussen, charging that he had violated the Union constitution by crossing the picket line. Rasmussen admitted both that he had crossed the union picket line and that he had performed an unspecified amount of "bargaining-unit work" that usually was performed by union employees covered by the Union–Golden Nugget bargaining agreement. Rasmussen was convicted by the membership and fined $1,000 and $100 for each day that he continued working behind the picket lines.

Rasmussen then filed a complaint with the NLRB, charging Local 501 with violating § 8(b)(1)(B) of the National Labor Relations Act (NLRA). *See* 29 U.S.C. § 158(b)(1)(B) (1982). This section prohibits unions from attempting to coerce an employer in the selection of its employees who have responsibility for adjusting employee grievances. Rasmussen's complaint was referred to an Administrative Law Judge (ALJ). The ALJ recommended that the complaint be dismissed, concluding that (1) the union's discipline could not possibly have coerced Rasmussen in his grievance adjustment duties and, (2) in any event, he performed more than a minimal amount of bargaining unit work and therefore the union could discipline him. The NLRB adopted the ALJ's recommendation but only addressed the second rationale for his decision. *See International Union of Operating Eng'rs, Local 501*, 287 N.L.R.B. No. 68 (1987). Rasmussen appeals.

## II.

## JURISDICTION

The NLRB had jurisdiction over the proceeding below pursuant to 29 U.S.C. §§ 158, 160(a) (1982). This court has jurisdiction to review the NLRB's decision under § 160(f).

## III.

## STANDARD OF REVIEW

In reviewing NLRB decisions, we have adopted the following standard:

> An NLRB order will be enforced if the Board's findings of fact are supported by substantial evidence in the record and if the Board correctly applied the law, even if the Court of Appeals might have reached a different conclusion based on the same evidence. *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 462–63 (9th Cir.1985). The NLRB's interpretation of the National Labor Relations Act is entitled to deference in the Court of Appeals, and the Court will uphold it if it is reasonably defensible. However, the Court will not rubber-stamp administrative decisions that it deems inconsistent with statutory mandates or that frustrate Congressional policy underlying the statute. *NLRB v. International Brotherhood of Electrical Workers, Local 952*, 758 F.2d 436, 439 (9th Cir.1985).

*NLRB v. International Bhd. of Elec. Workers, Local Union # 46*, 793 F.2d 1026, 1028–29 (9th Cir.1986).

## IV.

## ANALYSIS

Section 8(b)(1)(B) provides that a union commits an unfair labor practice if it "restrain[s] or coerce[s] ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances...." 29 U.S.C. § 158(b)(1)(B). Rasmussen claims that the union violated this statute when he was disciplined. Both parties agree that Rasmussen is a supervisor with grievance adjustment duties for the purposes of the NLRA.

The seminal case interpreting this provision is *Florida Power & Light Co. v. International Bhd. of Elec. Workers, Local 641*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). In this case, the Court reversed the NLRB and held that a union does not violate § 8(b)(1)(B) when it disciplines supervisor-members who cross a picket line and perform "rank-and-file struck work" (bargaining unit work) during a lawful strike. *Id.* at 802, 94 S.Ct. at 2743. In an oft-quoted paragraph, the Court stated:

> The conclusion is thus inescapable that a union's discipline of one of its members who is a supervising employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.

*Id.* at 804–05, 94 S.Ct. at 2744–45. The NLRB argued that this put supervisor members in an untenable position because, as supervisors, they could be fired for honoring the picket line but, as union members, they could be disciplined for crossing the picket line. The Court responded that § 8(b)(1)(B) was not intended to alleviate this dilemma. *Id.* at 807, 94 S.Ct. at 2746. To cross or not to cross must remain the question, one might say. Employers, on the one hand, can require supervisors to resign from the union as a condition of their employment. Or if they remain in the union, employers can discharge supervisors for their union activities, while the union can discipline them for performing "bargaining unit work." *Id.* at 808, 94 S.Ct. at 2746–47. Thus, the Court recognized that the supervisor member's dilemma was real, but concluded that § 8(b)(1)(B) was not intended to resolve the problem. *Id.* at 813, 94 S.Ct. at 2748–49. Congress, it appears, did not intend for the lot of the supervisor to be an easy one.[2]

American Broadcasting Cos. v. Writers Guild of Am., 437 U.S. 411, 98 S.Ct. 2423, 57 L.Ed.2d 313 (1978) (*ABC*) was the next decision interpreting § 8(b)(1)(B). In this case, the Court upheld the NLRB and concluded that a union may not discipline a supervisor member who crosses a picket line but performs only supervisor's duties. *Id.* at 430–31, 98 S.Ct. at 2434–35. The Court made clear that the crucial question in these cases is the effect the union discipline will have on the supervisor's grievance adjustment duties. "[T]he Board correctly understood [*Florida Power*] to mean that in ruling upon a § 8(b)(1)(B) charge growing out of union discipline of a supervisory member who elects to work during a strike, it may—indeed, it must—inquire whether the sanction may adversely affect the supervisor's performance of this collective-bargaining or grievance-adjustment tasks...." *Id.* at 430, 98 S.Ct. at 2434; *see also NLRB v. International Bhd. of Elec. Workers, Local 340*, 481 U.S. 573, 585, 107 S.Ct. 2002, 2010, 95 L.Ed.2d 557 (1987) ("[Section] 8(b)(1)(B) forbids only discipline for acts or omissions that occur while an employer-representative is engaged in § 8(b)(1)(B) activities."). Disciplinary immunity appeared to extend only to the performance of § 8(b)(1)(B) duties.

After these decisions, the NLRB properly focused on the type of work the supervisor performed when he crossed the picket line. However, the NLRB announced the "minimal work" doctrine to address those cases that fell within the extremes of *Florida Power* (supervisor performed only bargaining unit work) and *ABC* (supervisor performed no bargaining unit work). Beginning with its decision in *Chicago Typographical Union No. 16*, 216 N.L.R.B. 903 (1975), *enforced*, 539 F.2d 242 (D.C.Cir. 1976), *cert. denied*, 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978), the Board held that supervisor members who perform only a "minimal amount" of struck work

---

**2.** Rasmussen's dilemma was compounded by a provision in the Union's constitution that prohibited union members from resigning in anticipation of or during a strike. However, several recent decisions by this and other courts have struck down these provisions as violative of

§ 8(b)(1)(A). *See NLRB v. Sheet Metal Workers' Int'l Ass'n, Local 16*, 873 F.2d 236, 237 (9th Cir.1989); *International Union, UAW, Local 449 v. NLRB*, 865 F.2d 791, 793 (6th Cir.1989); *NLRB v. Local 73, Sheet Metal Workers' Int'l Ass'n*, 840 F.2d 501, 506–07 (7th Cir.1988).

cannot be disciplined for crossing a picket line. *Id.* at 904–05.[3] Not surprisingly, the question of what constitutes a minimal amount of struck work came to be litigated frequently. *See, e.g., New York Typographical Union Local 6*, 229 N.L.R.B. 886, 887, 891 (1977) (10% struck work is minimal); *Meat & Provision Drivers Union Local 626*, 224 N.L.R.B. 186, 187 (1976) (50% struck work is not minimal).

Rasmussen seeks to utilize this minimal struck work rule when he contends that the Board miscalculated the amount of bargaining unit work he performed *during the strike.* The dispute concerns the classification of various training functions Rasmussen performed and the amount of time he used the "tools of the trade." The ALJ, relying on both Rasmussen's admission at his union trial as well as the circumstances surrounding the strike, concluded that Rasmussen performed more than a minimal amount of bargaining unit work. First, the ALJ points out that prior to the strike, Rasmussen worked five days a week on the 6:30 a.m. to 3:30 p.m. shift, although he was "on-call" at other times. After the strike began, Rasmussen admitted that he did not leave the hotel for six weeks. In addition, Rasmussen used his tools on rare occasions before the strike. After the strike began, Rasmussen carried tools everyday for the first two months of the strike. During this period, Rasmussen also lectured the new replacements on how to perform their jobs, including demonstrations of various routine maintenance procedures. Rasmussen also admitted that before the strike he never performed extensive training duties and further that union members knew how to perform these tasks without any instruction. The ALJ found that Rasmussen also accompanied the new engineers on various maintenance calls and often "talked" the employee through repairs—even to the point of indicating which tools should be used.

The ALJ concluded: "What is clear, however, is that Rasmussen was somehow getting bargaining unit work done, and that he was accomplishing this ... even while the 'engineer' crew available to him was seriously lacking in necessary skills.... [T]his fact alone warrants a presumption that Rasmussen was required to play an unprecedented role in the accomplishment of unit tasks." The ALJ did not attempt to calculate the percentage of time Rasmussen spent doing bargaining-unit work because he found Rasmussen's statements on this issue to be "inconsistent, shifting, or irrelevant."

The Board adopted the ALJ's proposed order and agreed that Rasmussen performed more than a minimal amount of bargaining unit work. The Board agreed that the training functions were bargaining unit work and that, as a result, Rasmussen spent approximately 25% of his time performing bargaining unit work and further that this is more than a minimal amount.[4] Rasmussen contests this figure, arguing that he performed under 10% of bargaining unit work.

■ There is substantial evidence to support the Board's conclusion that Rasmussen performed more than a minimal amount of bargaining unit work. We therefore affirm the conclusion. In doing so, we agree with the Board that the training functions should be classified as bargaining unit work. *See Columbia Typographical Union No. 101 (The Washington Post)*, 242 N.L.R.B. 1079, 1082–83 (1979) (holding that training replacement typesetters was rank-and-file work).

Rasmussen seeks to fit within this court's decision in *NLRB v. International Union of Operating Eng'rs Local 501*, 806 F.2d 1405 (9th Cir.1986). In *Local 501*

---

3. Although never adopted by the Supreme Court, *see ABC*, 437 U.S. at 426 n. 23, 98 S.Ct. at 2432 n. 23, this court implicitly approved the minimal work doctrine in *NLRB v. International Union of Operating Eng'rs Local 501*, 806 F.2d 1405, 1407 (9th Cir.1986).

4. The Board never explained how it arrived at this percentage. This omission, however, is not fatal. The NLRB need not exactly quantify the amount of time the supervisor-member spent doing bargaining unit work in order to conclude that it was more than a minimal amount. *See Columbia Typographical Union No. 101*, 242 N.L.R.B. 1079, 1083 (1979).

supervising engineers at another Las Vegas hotel successfully challenged the union's imposition of fines. That court upheld the NLRB's conclusion that the fines in this case violated § 8(b)(1)(B). The facts in *Local 501* are quite different from those in this case. In *Local 501* management instructed its supervisor engineers to perform only supervisory duties and "not to touch any tools." *Id.* at 1408. Thus, it was clear that the supervisors performed no bargaining unit work. In contrast, Rasmussen admitted performing significant bargaining unit work.

Rasmussen also objects to the Union's imposition of a continuing fine for each day he continued to work behind the picket line after his union trial. Here he has a point. He contends that this continuing fine was imposed without regard to the kind of work he was performing, and therefore, to some degree, he is being fined for crossing the picket line, not performing bargaining unit work.

█ A union may not fine a supervisor member for crossing a picket line and performing his usual supervisory duties. *See, e.g., Warehouse Union Local 6,* 210 N.L.R.B. 666, 670, *enforced,* 497 F.2d 43 (5th Cir.1974); *Local 819, Int'l Union of Operating Eng'rs,* 209 N.L.R.B. 176, 179 (1974). Without any evidence that Rasmussen continued to perform bargaining unit work on each day he crossed the picket line, there was no basis upon which to impose fines for each such day. Since the union trial Rasmussen was fined a flat amount ($1,000) *and* $100 per day for each day he continued working behind the picket line. Without evidence of what Rasmussen did each day, he may have been fined for crossing the picket line, not for performing bargaining unit work. *See Bakery Workers Union, Local 734,* 238 N.L.R.B. 1354, 1358 (1978) ("[T]he circumstances under which the fines were imposed and the disproportionate size of those fines themselves af-

ford a clue to [the Union's] true reason for imposing the drastic penalties visited on these two supervisors....").

█ The NLRB contends that we may not review the reasonableness of any fines imposed by a union. In *NLRB v. Boeing Co.,* 412 U.S. 67, 74, 93 S.Ct. 1952, 1956–57, 36 L.Ed.2d 752 (1973), the Supreme Court held that the NLRB had no authority to review the reasonableness of any fines imposed by a union. State courts, rather than the NLRB, are the proper forum to adjudicate these claims. *Id.*[5] Our decision does not conflict with *Boeing.* We do not purport to review the *reasonableness* of the Union fine, rather we are reviewing only whether the Union discipline violates the NLRA. We therefore remand this case to the NLRB for a determination of whether Rasmussen continued to perform bargaining unit work on each day after the Union trial. Any violation that arises by reason of our requirement that each day since the union trial be examined is attributable to the per day character of the Union's fine. It cannot justify a per day fine assessed, say, for ten days when Rasmussen performed bargaining unit work on one day only. In other words, Rasmussen can be fined only for those days on which he performed bargaining unit work.

ENFORCEMENT GRANTED IN PART AND ORDER VACATED IN PART.

---

5. We recognize that the Court in *Boeing* was discussing § 8(b)(1)(A) of the NLRA, while this case involves § 8(b)(1)(B). This court and the District of Columbia Circuit have applied *Boeing* to § 8(b)(1)(B). *See International Bhd. of Elec. Workers, Local 134 v. NLRB,* 487 F.2d 1143, 1149 n. 14 (D.C.Cir.1973) (en banc), *aff'd,* 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974); *NLRB v. San Francisco Typographical Union No. 21,* 486 F.2d 1347, 1350 (9th Cir.1973) (opinion on rehearing), *cert. denied,* 418 U.S. 905, 94 S.Ct. 3195, 41 L.Ed.2d 1152 (1974).