USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1826 YESTERDAY'S CHILDREN, INC., Petitioner, Cross-Respondent, v. NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner. ____________________ PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Clare Hudson Payne, with whom Eaton, Peabody, Bradford & ___________________ ___________________________ Veague, P.A. was on brief, for petitioner. ____________ David B. Schwartz, Attorney, with whom Frederick C. Havard, _________________ ___________________ Supervisory Attorney, Frederick L. Feinstein, General Counsel, _______________________ Linda Sher, Associate General Counsel, and Aileen A. Armstrong, __________ ___________________ Deputy Associate General Counsel, were on brief, for respondent. ____________________ May 30, 1997 ____________________ LYNCH, Circuit Judge. The National Labor Relations LYNCH, Circuit Judge. _____________ Board filed a host of unfair labor practice charges under 8 of the National Labor Relations Act, 29 U.S.C. 158, against Yesterday's Children. Yesterday's Children is a non-profit corporation which operates, among other facilities, Agape House,1 a 20-bed residential nursing home for mentally retarded adults in Ellsworth, Maine. Evidence was heard in October 1993 by an Administrative Law Judge, who recommended dismissal of all the charges, based in part on his credibility determinations after observing the witnesses. His decision was reviewed by a three-member panel of the NLRB. The case comes here with only two of the various charges still at issue: charges relating to disciplinary actions taken against two employees, nursing assistant Laura Cunningham and charge nurse Jean Smith. As to these two charges, the Board reversed the ALJ and found that the employer's actions were illegal because the conduct of the two employees was protected by 7 of the Act, 29 U.S.C.  157. Cunningham had been issued a written reprimand for "conduct unbecoming" after calling a co-worker to enlist her support in a letter-writing campaign to the employer in support of a recently discharged supervisor. Smith had been  ____________________ 1. During this litigation, the facility's name was changed from Agape House to Birchwood Living Center. -2- 2 issued two written reprimands and then discharged, purportedly for her role in two incidents involving patient care. The Board ordered reinstatement and back pay for Smith and ordered the removal of the reprimands of both Smith and Cunningham from the employer's files. Yesterday's Children petitions this court for review, and the General Counsel cross-petitions, seeking enforcement of the Board order. We enforce the Smith order, but vacate the Cunningham order and remand that portion of the case to the Board for further consideration. I. The facts are now largely undisputed. During the first half of 1992 Laura Cunningham was a nursing assistant at Agape House, and Smith was a charge nurse2 there. Cunningham had been working at Agape House since 1988, and Smith since 1985. In January 1992, Jeffrey Cake was hired as the Executive Director of Yesterday's Children and the Administrator of Agape House. In mid-June 1992, Cunningham and Smith attempted to start a letter-writing campaign to the employer's Board of Directors in support of the recently discharged Glenda  ____________________ 2. The record does not reveal the specific duties and responsibilities of charge nurses at Agape House. It appears that the charge nurse is the head nurse on a given shift, that is, the person at the facility who is primarily responsible for the medical care of the residents. -3- 3 Leavitt. Leavitt is alternately described in the record as the "Program Director" at Agape House and the "Qualified Mental Retardation Professional" ("QMRP") at Agape House.3 Leavitt had been fired by Cake on June 11, after a series of letters from state authorities led Cake to conclude that Leavitt did not have the required professional qualifications for the position. At the time of the campaign, Leavitt was appealing her dismissal to Yesterday's Children's Board of Directors. On June 13, Cunningham called Lucinda Sargent, another nursing assistant, at home from a nursing station telephone to try to enlist Sargent's support in the letter- writing campaign. Resolving a factual dispute between Cunningham and Sargent, the ALJ determined that Cunningham made the call during her work shift. The Board did not question this finding. Cunningham made several derogatory remarks about Cake in the course of this telephone conversation, referring to him as an "asshole," and saying that she would like to "get rid of" him.   ____________________ 3. Whatever her title, the record reflects that Leavitt was in charge of the implementation and development of active treatment services for the residents. It was her responsibility to assess, evaluate, and make recommendations to an interdisciplinary team of employees on goals and objectives for the residents and to monitor and review those plans as they were implemented. She was also involved in employee scheduling.  -4- 4 Sargent complained to her supervisor, Gayle Haslam, about the call. Haslam reported the incident to Cake, who wrote a letter to Cunningham stating that her call to Sargent "during regular working hours" was, if the facts as reported to him were accurate, "just cause for dismissal." Cake then met personally with Cunningham to discuss the incident, and concluded that Cunningham's effort was directed not at supporting Leavitt, but at getting him (Cake) fired. A few days later, Cake sent Cunningham a second letter which constituted a "formal reprimand" for "conduct unbecoming." On a contemporaneous "employee counseling form," Cake noted that he had reprimanded Cunningham for "using agency resources and time to agitate against the actions of the administration including attempts to place undue stress on other staff while on duty." Cunningham was not fired.4 The conflicts between Cake and Smith ran deeper. Almost immediately upon Cake's arrival at Yesterday's Children, the two were at odds. The ALJ traced this enmity to January 1992, when a group of employees submitted to Cake  ____________________ 4. A second unfair labor practice charge regarding Cunningham involved an alleged "interrogation" of Cunningham by Cake in response to rumors of a strike in protest of the firing of Leavitt. Cunningham claimed that Cake threatened to fire any employee who walked out, but the ALJ credited Cake's corroborated testimony that he made no such threat. The Board upheld the ALJ's dismissal of this charge, and the General Counsel does not press this claim on appeal. -5- 5 a letter requesting the reinstatement of Liz Martin, an employee Cake had fired. Smith's name led the list of signatories.5 Then, in early February, Smith angrily confronted Cake, in front of another employee, over a memo he had issued to employees stating that he intended to withhold paychecks for a week to enable the corporation to ride out a cash flow crisis. Cake issued Smith an official letter of reprimand after this incident, which he later withdrew after Smith explained her views to him in greater detail. In June, Cake discharged Leavitt, and Smith was among the employees who supported Leavitt's bid for reinstatement. Smith and Cunningham initiated a letter- writing campaign on Leavitt's behalf. Additionally, on July 12, Smith and Leavitt met with representatives of the Office & Professional Employees International Union regarding organizing the facility. Then, on July 14, Smith read a prepared letter in support of Leavitt to the employer's Board of Directors, which was meeting at a local hotel to hear Leavitt's appeal of her termination.6 Smith's statement included sharp criticism of Cake. After discussing the circumstances of Leavitt's dismissal by Cake, for instance, Smith claimed "no professionalism was exhibited." She stated  ____________________ 5. Cunningham also signed this letter, a fact noted by neither the ALJ nor the Board. In addition, thirty-one other employees signed the letter. 6. This appeal was ultimately denied. -6- 6 that Cake "has managed to frighten [the staff] into submission and silence by threatening them with lawsuits and their jobs." Smith also criticized Cake's budget-cutting decisions, which, she claimed, had caused a deterioration in the physical appearance of Agape House, posing health hazards to the residents. During the meeting, the Union distributed flyers outside on the street.  Smith was also involved in two patient care incidents in July 1992. One was denominated the "choking incident." On July 10, Smith was at the nursing station talking with Dale Zebulske, Leavitt's replacement as QMRP, when they heard a brief scuffle a short distance away. After peering down the hall, Smith said to Zebulske, whose back was to the incident, "Patient ___ is choking patient ___." Smith claims to have been joking and claims that there had been no choking at all. Zebulske, however, did not realize she was joking. Later that day, Zebulske happened to be on the phone with the mother of the resident he thought was the victim of the choking attack. Though it was apparently against Agape House policy,7 he mentioned the incident to the mother, who later complained to state authorities. Although Smith would  ____________________ 7. No explicit findings were made on this point, but the Board apparently credited Smith's undisputed testimony that Yesterday's Children policy prohibited anyone other than the staff social worker, Philip Hurley, from contacting residents' parents about incidents like the one Zebulske thought had occurred. -7- 7 be required to write up an "incident report" in the event of an incident like the one Zebulske believed occurred, she did not doso (because,according toher, therehad beenno incident). On July 16, at the request of Joan Abbott, the acting Director of Nursing,8 Smith wrote an explanation of the phantom incident; she said that she had simply remarked to Zebulske that it "looked like" one of the residents was "going to choke" the other, but that she had no idea that Zebulske understood her to be saying that a choking attempt had in fact been made. (Later, at the hearing, Smith testified that she had been joking and that she had not realized that Zebulske was taking her seriously.) On July 21, Goss verbally counseled Smith for her "poor judgment" and issued a written confirmation of the counseling. Cake signed off on this written confirmation. The second patient care episode was denominated the "sunburn incident." On July 16, a resident returned from an outing with a serious sunburn on his shoulder. Verna Chick, a staff member who had been on the outing, reported the sunburn to Cake and to Smith, who was the charge nurse on duty at the time. As required, Chick wrote up an "incident report."  ____________________ 8. Abbott, a nurse at Agape House, was filling in temporarily for Betty Goss, the facility's Director of Nursing, while Goss was on vacation. -8- 8 Smith applied another resident's prescription Silvadene ointment to the sunburn.9 Smith noted this treatment on Chick's incident report, and also made a notation in the "24-hour notebook," a notebook in which nurses on different shifts communicate with each other concerning patient matters. She did not, however, record the incident in the "medical logbook" (the book in which individualized records concerning each resident are kept) and did not enter it into the "nursing notes" (the formal record of nursing actions).10 These were both violations of policy. Later, Smith told Ben Starbuck, the charge nurse in the next shift (the overnight shift), about the sunburn. Starbuck checked the resident's sunburn while the resident slept but took no other action. Starbuck, in turn, claims that he informed Virginia Conklin, the charge nurse who took over in the morning, about the sunburn. Conklin later told Cake she had not been informed of the sunburn, but at the hearing admitted that she had been told. Some time the next morning, during Conklin's shift, nursing assistant Sargent  ____________________ 9. The state investigators, who came in later, erroneously concluded that the resident's sunburn went untreated for sixteen hours. Both the ALJ and the Board found that Smith had in fact promptly treated the sunburn with Silvadene. 10. After receiving a written reprimand about the sunburn incident, however (see below), Smith was advised by one of the state investigators to prepare a late entry in the nursing notes stating that she had applied Silvadene ointment to the sunburn. She did this. -9- 9 (the nursing assistant whom Cunningham had called about Leavitt) allowed the sunburned resident to get into a hot whirlpool bath, which caused extreme blistering of the sunburn. Sargent, who claims that she had not known about the sunburn, told Conklin about the problem. Conklin then went to Cake, at which time Conklin denied having been informed about the sunburn. Conklin then arranged for a prescription of Silvadene ointment for the resident. On July 27, three inspectors from the State Department of Human Services, which had received anonymous complaints about Agape House, showed up unannounced at the facility to investigate, inter alia, the two incidents. At _____ ____ the end of their visit, the state investigators gave Goss a hand-written list of deficiencies. Several shortcomings were noted, including the sunburn incident (but not the choking incident). The listed deficiencies were: (1) failure properly to treat a resident for an ear infection; (2) treatment of a resident with a psychotropic drug without the consent of his guardian; (3) failure to establish proper procedures for the use of two psychotropic drugs; and (4) failure to treat a sunburn for sixteen hours. An official letter of violation followed on August 19, materially identical to the July 27 hand-written list. On July 28, Smith, along with fifteen other employees, attended a Union organizing meeting and signed an -10- 10 authorization card. The next day, Goss told Cake about the meeting, but it is unclear from the record whether she told him, or he otherwise discovered, that Smith was among the employees who had attended the meeting. On August 4, Goss issued Smith two separate written reprimands for her role in the sunburn incident and the choking incident. The choking incident reprimand stated that James Barnes, one of the state inspectors, "was very concerned about the issue of your judgement [sic] and not satisfied with the administrators [sic] recommendations of counseling." However, Barnes testified before the ALJ and denied having ever expressed any such dissatisfaction. The sunburn incident reprimand stated that Smith's "failure to note [the sunburn] within [the patient's] medical records or examine him carefully, resulted in his being placed in the whirlpool . . . ." The letter went on to state that Smith "failed to properly act, both in terms of record keeping and in terms of making recommendations to the nurse assuming duty after [her] shift." On August 10, Smith was fired. The discharge letter from Cake cited her conduct in the sunburn and choking incidents and her lack of "consistent good judgment." Smith's appeal of her termination to the board of directors was denied. II. -11- 11 Because the employer asserts that there is not substantial evidence supporting the Board's unfair labor practice determinations, and because the Board and the ALJ reached contrary conclusions, it is helpful to understand the opinions of the Board and of the ALJ. Cunningham __________ The ALJ found that Cake "honestly" believed that Cunningham, in calling Sargent, was agitating for his dismissal. This aspect of the call, said the ALJ, was what "bothered Cake the most." The ALJ found that the phone call "was clearly divorced . . . from any activity under the Act" both because it was made on company time using company resources (the nursing station phone) and because of Cunningham's derogatory remarks about Cake. Hence, the letter of reprimand from Cake, concluded the ALJ, though it "may have not been completely appropriate," was "not unlawful." On appeal, the Board, without analyzing whether Cunningham's call was protected by 7,11 ruled that it did  ____________________ 11. Section 7 provides, in relevant part, that: Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid and protection . . . . 29 U.S.C. 157. -12- 12 not lose the protection of the Act because it was made on company time or because of the derogatory remarks. The Board reversed the ALJ, finding that the employer violated 8(a)(1).12 The remarks about Cake, said the Board, were "not so egregious as to cause her to lose the protection of the Act." The prime focus of Cunningham's efforts, reasoned the Board, was not to get Cake fired but was to get Leavitt reinstated, adding: [E]mployees who are engaged in Section 7 activity in protest of actions by their employer do not lose the protection of the Act simply because they mention that they dislike an employer manager and would like to see the manager discharged. The Board stressed that there is no evidence that Cunningham took any affirmative steps to get Cake fired. Without discussing whether an employee's use of company time and company resources to engage in the kind of activity at issue here might justify a reprimand, the Board stated that the employer had failed to establish that it disciplined Cunningham for this reason. The disciplinary action, said the Board, was in response to the offensive remarks, not to Cunningham's use of company resources, and, on these facts, this was impermissible.  ____________________ 12. Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in [ 7]." 29 U.S.C. 158(a)(1). -13- 13 Smith _____ The Board's General Counsel asserted that Smith was fired for her engagement in activities protected under 7 of the Act. In contrast, the employer argued that she was fired for her poor judgment and breach of proper protocol. The ALJ employed the Wright Line burden-shifting paradigm in his ____________ analysis. See Wright Line, 251 N.L.R.B. 1083 (1980), ___ ____________ enforced, 662 F.2d 899 (1st Cir. 1981). He found that the ________ General Counsel had failed to "make a prima facie showing sufficient to support the inference that conduct protected under the Act was a motivating factor" in Smith's reprimands and discharge. The ALJ found that "Smith's actions in the 'choking' and 'sunburn' incidents did prompt, in part the state investigation" and that this, "together with Cake's personal dislike for Smith," resulted in the reprimands and termination. Thus, the burden never shifted to the employer to show that the punishment would have occurred even in the absence of protected conduct and the analysis ended there. The ALJ concluded that there was no unfair labor practice. The Board, on appeal, reversed, finding a violation of 8(a)(1) under the same Wright Line burden-shifting ____________ analysis. The elements necessary to make out a prima facie case, stated the Board, are "protected activity, knowledge, timing, and animus." The Board said that all these elements were met here. Smith engaged in a variety of protected -14- 14 activities; the employer knew about her engagement in these activities; her reprimands and her termination were in "close proximity" to the employer's learning about her protected activities; and the employer's animus "toward Smith's protected activities in particular, and its employees' protected activities in general, is clear." The Board agreed with the ALJ that Cake had acted out of a personal dislike for Smith, but disagreed about the import of this fact: Cake's dislike of Smith arose initially from Cake's resentment of Smith's protected activities. . . . Thus, as Cake's dislike began from animosity over protected activity, we infer that this "dislike" was a product of animus toward Smith's protected activity. Thus, the Board found that the General Counsel successfully made out his prima facie case. The burden then shifted, on the Board's analysis, to Yesterday's Children to show that it would have disciplined and discharged Smith even if she had not engaged in protected activities. The Board found that the employer's proffered explanation -- that Smith failed to show "'consistent good judgment in [her] duties and responsibilities' with respect to the 'sunburn' and choking' incidents" -- was pretextual, and that the employer had "failed to show that it would have taken the same action in the absence of Smith's protected activity." -15- 15 With regard to the "choking incident," the Board noted that Zebulske, who violated company policy by informing the resident's mother about the phantom incident, was at least equally responsible for the state investigation, and yet was not disciplined at all. Additionally, the August 4 reprimand from Goss explained, in light of the fact that Smith had already been scolded on July 21 for her role in the incident, that further reproach was in order because Barnes, one of the state investigators, was concerned about the issue of Smith's judgment and dissatisfied with the leniency of the counseling. Barnes, however, testified at the hearing that he had stated no such concern or dissatisfaction. Regarding the "sunburn incident," the Board challenged Cake's explanation that Goss issued the reprimand to Smith on August 4 based on the state investigators' report, which found that Smith had engaged in "abuse" by neglecting to treat the resident's sunburn. The Board, in discrediting this explanation, noted that the report did not issue until August 19, after the reprimand and after the discharge.13 Additionally, while the state investigators'  ____________________ 13. The Board misread the record. The state investigators, on the day of their investigation, July 27, gave Cake a hand- written list of deficiencies, which foreshadowed their formal findings. The sunburn incident was listed among the deficiencies on this note: "Client suffered a sunburn resulting in blisters on left shoulder and not treated for over 16 hours." The formal letter, dated August 19, reiterated: "[C]lient sustained a sunburn on 7/16/92, while at day program, which resulted in blisters to his left -16- 16 report referenced by Goss's letter of reprimand listed various deficiencies at Agape House, the Board noted that only Smith was disciplined in response to these deficiencies. In conclusion, the Board said: [H]aving found that the General Counsel established a prima facie case warranting an inference that Smith was reprimanded and subsequently discharged for her protected concerted activity, and having found that [Yesterday's Children's] explanations for its actions were pretextual and that the actual reason for Smith's reprimands and discharge were her protected concerted activities, we conclude that [Yesterday's Children] violated Section 8(a)(1) by reprimanding and subsequently discharging Smith. III. Our standard of review for decisions of the Board is a deferential one. "As the Board is primarily responsible for developing and applying a coherent national labor policy, we accord its decisions considerable deference." NLRB v. ____ Boston Dist. Council of Carpenters, 80 F.3d 662, 665 (1st ____________________________________ Cir. 1996) (internal citation omitted). We may not substitute our judgment for the Board's when the choice is  ____________________ shoulder. The physician was not notified and treatment was not administered until 7/17/92." The criticisms in the two writings are fundamentally the same; the formal letter contained no new details. The Board therefore erred in determining that the employer could not have relied on the state investigators' findings on August 4 and August 10. The investigators' citation erroneously stated that Smith failed to treat the sunburn. In fact, she did treat it, but with another resident's prescription ointment. In either event, she violated nursing policy. -17- 17 "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 ______________________ ____ U.S. 474, 488 (1951). This is not to say, however, that we simply "rubber stamp" the decisions of the Board. See Kelley ___ ______ v. NLRB, 79 F.3d 1238, 1244 (1st Cir. 1996). We enforce a ____ Board order only if the Board correctly applied the law and if its factual findings are supported by substantial evidence on the record. Acme Tile & Terrazzo Co. v. NLRB, 87 F.3d __________________________ ____ 558, 560 (1st Cir. 1996); Boston Dist. Council of Carpenters, __________________________________ 80 F.3d at 665; see N.L.R.A. 10(e), 29 U.S.C. 160(e). ___ We address separately the Board's two findings of unfair labor practices. Cunningham __________ There can, of course, be no violation of 8(a)(1) by the employer if there is no underlying 7 conduct by the employee. Conduct must be both concerted and protected to fall within 7. In finding a 8(a)(1) violation, however, neither the Board nor the ALJ analyzed the issue, a close one in this case, of whether Cunningham's concerted activity was protected by 7. This compels a remand to the Board for further consideration. The ALJ found that: Cunningham's phone call to Sargent was improper because it was a personal call made during working time from the nursing station phone, rather than the employee's -18- 18 phone. But what bothered Cake the most, understandably, was the derogatory remarks made about him . . . . That part of Cunningham's call to Sargent regarding support for Leavitt could be considered protected concerted activity, if taken alone, but other aspects of the call (which bothered Cake the most) clearly divorced the call from any activity protected under the Act. The Board, in reversing the ALJ and finding a violation of 8(a)(1), misinterpreted the ALJ's reasoning and in so doing "glossed over the analytically tough question presented here." NLRB v. Auciello Iron Works, Inc., 980 F.2d ____ _________________________ 804, 811 (1st Cir. 1992). The Board stated that the ALJ "found that Cunningham's efforts on behalf of Leavitt were concerted and protected," but that [c]ontrary to the [ALJ], we do not find that Cunningham's activities lost the protection of the Act either because (1) the conversation contained derogatory remarks about Cake, or (2) the conversation alluded to the discharge of Cake, or (3) the telephone call was made during working time from the nursing station. The difficulty with the Board's position is that the ALJ did not find that Cunningham's action was protected; he simply ___ posited that even if her act were protected it would lose its ____ __ protection because of the manner in which she acted. The end result is that neither the ALJ nor the Board addressed the basic legal issue underlying whether Cunningham's phone call was protected by 7: Leavitt's -19- 19 undisputed status as a "supervisor"14 and the special standards under 7 pertaining to employee protests of the employer's supervisor-related actions. The General Counsel argues that the Board properly understood the ALJ's analysis. This assertion is undermined, however, by the ALJ's failure even to mention Leavitt's status as a supervisor, let alone that such status was relevant to the 7 inquiry. The ALJ, on our reading of his decision, did not find that Cunningham's call was protected by the Act, and the Board erred in concluding that the conduct was protected without undertaking the appropriate legal analysis. The correct analysis, as both parties implicitly recognized, must begin with the fact that Leavitt was a "supervisor" for purposes of the Act, see N.L.R.A. ___ 2(11), 29 U.S.C. 152(11), and that Cunningham's phone call was at best an employee protest about a supervisory staffing matter. It is fundamental to the structure of the Act that "not all forms of employee protest over supervisory changes are per se protected." Puerto Rico Food Prods. Corp. v. _______________________________ NLRB, 619 F.2d 153, 155 (1st Cir. 1980); Abilities & Goodwill ____ ____________________ Inc. v. NLRB, 612 F.2d 6, 8-10 (1st Cir. 1979); see also NLRB ____ ____ ___ ____ ____ v. Sheraton Puerto Rico Corp., 651 F.2d 49, 51 (1st Cir. ___________________________  ____________________ 14. The General Counsel concedes this point. Additionally, Zebulske, Leavitt's replacement as QMRP, is clearly viewed by the General Counsel as a member of management. -20- 20 1981) ("[W]hen non-supervisory employees engage in activity directly related to the retention of supervisors . . . the Board must proceed with caution."). Section 7 shields employees from hostile employers when the employees seek, through union membership or otherwise, to band together for the purpose of "mutual aid or protection." The guiding policy behind 7 is not implicated when supervisors, who are management's "faithful agents," are the ones concertedly agitating against the employer's actions. Sheraton Puerto _______________ Rico, 651 F.2d at 51 (quoting H.R. Rep No. 245, 80th Cong., ____ 1st Sess. 16-17 (1947)); see N.L.R.A. 2(3), (11). And, ___ similarly, the policy is not clearly implicated when non- supervisory employee concerted activity concerns supervisory staffing matters. "Traditionally, the interest of the employer in selecting its own management team has been recognized and insulated from protected employee activity." Abilities & Goodwill, 612 F.2d at 8; see also NLRB v. Oakes ____________________ ___ ____ ____ _____ Mach. Corp., 897 F.2d 84, 89 (2d Cir. 1990) ("Employee action ___________ seeking to influence the identity of management hierarchy is normally unprotected activity because it lies outside the sphere of legitimate employee interest."). We have held that two basic criteria must be met for employee concerted action regarding supervisory staffing matters to gain the protection of 7. Puerto Rico Food _________________ Prods., 619 F.2d at 155; Abilities & Goodwill, 612 F.2d at 8- ______ ____________________ -21- 21 10. "First, the employee protest over a change in supervisory personnel must in fact be a protest over the actual conditions of their employment," and second, "the means of protest must be reasonable." Puerto Rico Food _________________ Prods., 619F.2d at155-56 (internal quotationmarks omitted).15 ______ Because the Board did not analyze this key issue, we vacate the Cunningham order and remand to the Board for further consideration. See NLRB v. Acme Tile & Terrazzo Co., ___ ____ ________________________ 984 F.2d 555, 555 (1st Cir. 1993) (per curiam); see also Acme ___ ____ ____ Tile & Terrazzo, 87 F.3d at 560; cf. NLRB v. Food Store ________________ ___ ____ ___________ Employees Union, 417 U.S. 1, 9-10 (1974); Sullivan Bros. ________________ _______________ Printers, Inc. v. NLRB, 99 F.3d 1217, 1231 (1st Cir. 1996). ______________ ____ "[T]the task of defining the scope of 7 is for the Board to perform in the first instance as it considers the wide variety of cases that come before it." NLRB v. City ____ ____ Disposal Sys., Inc., 465 U.S. 822, 829 (1984) (internal _____________________  ____________________ 15. This test, which traces back at least half a century, has been fashioned through an interplay between the Board and the courts of appeals. See, e.g., Phoenix Mut. Life Ins. ___ ____ ________________________ Co., 73 N.L.R.B. 1463 (1947), enforced, 167 F.2d 983 (7th ___ ________ Cir. 1948); Guernsey-Muskingum Elec. Coop., Inc., 124 ________________________________________ N.L.R.B. 818 (1959), enforced, 285 F.2d 8 (6th Cir. 1960); ________ Dobbs Houses, Inc., 135 N.L.R.B. 885 (1962), enforcement ___________________ ___________ denied, 325 F.2d 531 (5th Cir. 1963) (enforcement denied ______ because employee acts in support of discharged supervisor not "reasonable"); Abilities & Goodwill, Inc., 241 N.L.R.B. 27, ___________________________ enforcement denied, 612 F.2d 6 (1st Cir. 1979) (employee acts __________________ not reasonable due to lack of nexus between dispute and means of protest); Oakes Machine Corp., 288 N.L.R.B. 456 (1988), ____________________ enforced in relevant part, 897 F.2d 84 (2d Cir. 1990). The __________________________ Board is not free to ignore its own precedent. Auciello, 980 ________ F.2d at 812. -22- 22 quotation marks omitted). But "[a] court may require that the Board's decision 'be supported by articulate, cogent, and reliable analysis.'" Auciello Iron Works, 980 F.2d at 813 ____________________ (quoting Northport Health Servs., Inc. v. NLRB, 961 F.2d _______________________________ ____ 1547, 1553-54 (11th Cir. 1992)). If the Board believes that Cunningham's call to Sargent in support of Leavitt was protected by 7, it should explain its reasoning. See ___ Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, ____________________________ _____________ 167-68 (1962). In particular, the Board should explain how Leavitt's termination relates to the non-supervisory employees' working conditions. Of course, every dispute over managerial employees involves working conditions to some degree; after all, the jobs of many managers in large part involve creating and maintaining such conditions. Yet . . . there must be a somewhat more direct relationship than this to the concerns of ordinary workers before concerted action aimed at the choice of managers enjoys the Act's protection. Sheraton Puerto Rico, 651 F.2d at 53; see also Puerto Rico _____________________ ___ ____ ___________ Food Prods., 619 F.2d at 156-57. ___________ We do not reach the issue -- about which the ALJ and the Board are in apparent disagreement -- of whether Cunningham's conduct, if initially protected, would be stripped of its protection because of her derogatory comments about Cake and/or the fact that she made the call during her working shift from a company phone. We note only that, as a -23- 23 conceptual matter, an employee's act or course of conduct certainly could lose the protection it would otherwise have enjoyed under 7 because of the "abusive manner" in which the employee behaved. City Disposal Sys., 465 U.S. at 837; __________________ El Gran Combo de Puerto Rico v. NLRB, 853 F.2d 996, 1006 (1st ____________________________ ____ Cir. 1988); Keosaian v. NLRB, 630 F.2d 36, 38 (1st Cir. 1980) ________ ____ (per curiam). Smith _____ 1. Motion to Amend Pleadings _____________________________ We address first a threshold issue in the Smith claim. Yesterday's Children asks that the Smith case be remanded to the Board with instructions to allow Yesterday's Children to raise the argument, not made before the ALJ or the Board, that Smith is a "supervisor" under the Act, see ___ N.L.R.A. 2(11), instead of an "employee," see N.L.R.A. ___ 2(3), and that as such she lacks the protections accorded employees under 7. See generally Sheraton Puerto Rico, ___ _________ ____________________ 651 F.2d 49. The Smith claim, if this argument were to carry the day, would fail ab initio. _________ Yesterday's Children attempted to raise this argument before the ALJ, but failed due to procedural default. It now argues that the ALJ erred in denying its post-hearing motion to amend its answer, and that the Board erred in upholding this erroneous ruling. We review a denial of a motion to amend the pleadings for abuse of discretion. -24- 24 Golas v. HomeView, Inc., 106 F.3d 1, 3 (1st Cir. 1997); Reid _____ ______________ ____ v. New Hampshire, 56 F.3d 332, 342 (1st Cir. 1995); see also ______________ ___ ____ Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 792 (1st _____ ___________________________ Cir. 1995). We place the matter in context. Yesterday's Children moved, almost two years into the litigation, to amend its answer in order to deny that Smith is an "employee." Relying on an intervening Supreme Court decision, NLRB v. Health Care & Retirement Corporation of ____ _________________________________________ America, 114 S. Ct. 1778 (1994), Yesterday's Children sought _______ to assert the affirmative defense that Smith, as a charge nurse, is a "supervisor." There were, at the time, various NLRB proceedings occurring simultaneously involving this employer. One of these proceedings (RC-19849) involved the certification of a claimed bargaining unit which included the facility's charge nurses. In this proceeding, the employer took the position that the charge nurses were supervisors under the Act, rather than employees. But the Regional Director, to whom the NLRB had delegated its authority pursuant to 3(b) of the Act, 29 U.S.C. 153(b), found to the contrary on September 29, 1992. The employer petitioned the NLRB for review of this decision. In light of the adverse ruling in the certification case, but before the NLRB had yet acted on the request for review, the employer chose not to deny that Smith was an -25- 25 employee in its November 19, 1992 answer to the complaint in this unfair labor practice case. Shortly thereafter, on December 14, 1992, the NLRB turned down the employer's request for review of the Regional Director's finding in the certification case. The ALJ conducted the three-day hearing in this unfair labor practice case in early October 1993. Then, before the ALJ issued his decision, the Supreme Court decided Health Care on May 23, 1994, after which the employer ___________ sought to amend its answer on June 22. The ALJ, in a footnote to its written opinion in this case, issued eight days later on June 30, denied the motion without explanation, and the Board affirmed the denial on untimeliness grounds. In defense of this ruling, the General Counsel cites the basic proposition that "an intervening court decision that suggests a new and previously unmade argument to a respondent is not a circumstance that excuses a failure to raise the argument before an administrative agency at the time appropriate under the agency's practice." True enough,16 but at the same time it is not entirely fair to characterize the employer's argument here as "new and  ____________________ 16. See, e.g., United States v. L.A. Tucker Truck Lines, ___ ____ ______________ _________________________ Inc., 344 U.S. 33, 36-37 (1952); NLRB v. International Health ____ ____ ____________________ Care, Inc., 898 F.2d 501, 507 (6th Cir. 1990); Szewczuga v. __________ _________ NLRB, 686 F.2d 962, 971 (D.C. Cir. 1982). But see Sure-Tan, ____ ________ _________ Inc. v. NLRB, 467 U.S. 883, 896 n.7 (1984) (deeming ____ ____ "substantial change in controlling [case] law" an "extraordinary circumstance," and thus allowing employer to raise a new argument not raised before the Board). -26- 26 previously unmade." The broader reality is that this same respondent had unsuccessfully raised an identical argument in a recent and related case before the same administrative body. Still, while the issue is a close one, the denial of the motion was not an abuse of discretion. Significantly, the NLRB had not yet ruled, at the time of the employer's initial filing of its answer in this case, on the employer's petition for review of the Regional Director's earlier ruling on the charge nurses' non-supervisory status. The fact that the employer itself had sought review of the Regional Director's decision, and that this request was pending at the time the answer here was filed, shows that the employer did not regard the Regional Director's decision as a final agency determination. The employer should have preserved the argument in this case by raising it in the pleadings. 2. Merits __________ Both the ALJ and the Board assumed without inquiry, for the purpose of the Wright Line analysis, that Smith had ___________ engaged in a range of protected activities before being disciplined by the employer: Smith's signing a letter to Cake seeking the reinstatement of a co-worker, Liz Martin; her confrontation with Cake over Cake's decision to withhold employee paychecks; her initiation of the Leavitt letter- -27- 27 writing campaign; her appearance before the employer's board of directors on Leavitt's behalf; and her two meetings with Union organizers. The Board found that Cake fired Smith because he did not like her, and that this dislike "arose initially from [his] resentment of [her] protected activities." Thus, concluded the Board, she was fired because of her protected activities.  We discount two of Smith's activities that the Board deemed protected because they were done in support of Leavitt. The Board's analysis is flawed in precisely the same way as its analysis of Cunningham's conduct. However, Smith's other cited activities -- the Martin letter, the paycheck dispute, and the Union activity -- are obviously protected. They provide sufficient evidence in the record to uphold the inference drawn by the Board that Cake disliked Smith because of her engagement in protected activities. The Board's view that Cake was, in effect, discharging Smith for her involvement in these protected activities is a reasonable one. See National Ass'n of Letter Carriers, 315 N.L.R.B. ___ ___________________________________ 1176, 1178 & n.10 (1994) (if employer's animus towards employee begins in response to employee's protected act, Board will presume later animus derives from same unless contrary evidence presented). The employer argues that it has met its Wright Line ___________ burden because it would have disciplined Smith anyway, even -28- 28 absent the protected activities, for her involvement in the choking incident and the sunburn incident. Cake based the August 10 letter of dismissal largely on the two August 4 letters of reprimand for those two incidents. If the two letters of reprimand are pretextual, it follows, as the Board recognized, that the letter of dismissal is also pretextual. We address the two incidents in turn, concluding that there is sufficient support for the Board's position that both letters are pretextual. Smith's joke about an attack by one resident against another was clearly a breach of professional judgment, especially since Zebulske, the person to whom she made the facetious remark, had only begun working at Agape House four days earlier and may not have known Smith well at this time. The Board, in calling it a "nonevent," blithely understated the seriousness of the incident.17 The possible choking of one resident by another is not a joking matter. However, the fact remains that both the timing of the August 4 letter of reprimand and the explanation offered by the employer for the discipline raise suspicions. Smith had already been verbally counselled by Goss on July 21 about her role in the choking incident. Cake had  ____________________ 17. The General Counsel is equally cavalier about the choking incident, claiming that Zebulske's decision to tell the resident's mother was the "sole cause" of the controversy. -29- 29 recommended this counseling, and he signed off on the counselling form. This level of discipline apparently satisfied him for two weeks. The matter appeared to be closed, until it was reopened by the August 4 letter. The employer's stated reasons for increasing the discipline on August 4 were that Smith's breach of judgment had, in part, led to the state investigation and that one of the investigators was dissatisfied with the leniency of the July 21 counselling. Both explanations by the employer are undercut by the record. The investigators' hand-written statement of deficiencies made no mention of the choking incident (nor did the formal letter of citation that followed). The statement in the August 4 letter that the regional advocate, Barnes, was "not satisfied" with the prior disciplinary measure is even more directly contradicted by the evidence. In testimony before the ALJ, Barnes stated that, while he was aware of the choking incident and had discussed it with Cake, he did not express dissatisfaction withthe informalcounselling orrecommendadditional discipline. Additionally, the employer took no disciplinary action against Zebulske, who shared responsibility with Smith for the scandal. It was Zebulske who, contrary to company policy, informed the resident's mother of the alleged choking. The existence of disparate treatment for similar misconduct can support a finding of improper motive. See ___ -30- 30 Wyman-Gordon Co. v. NLRB, 654 F.2d 134, 141 (1st Cir. 1991). _________________ ____ Given the employer's implausible explanations and the disparate treatment of Smith and Zebulske, the Board's conclusion that the August 4 reprimand was pretextual is supported by substantial evidence in the record. The sunburn incident, like the choking incident, raises serious concerns about patient care. The story is troubling in two distinct ways. First, while the resident was promptly treated, the treatment was with someone else's prescription ointment and the treating nurse, Smith, failed to create complete records. Second, the resident was allowed the next morning to get into a hot whirlpool bath, which caused severe blistering. Clearly, patient care was compromised even before the whirlpool, and Smith is squarely to blame for this. Nevertheless, there is substantial evidence in the record to support the Board's conclusion that the employer's August 4 letter of reprimand to Smith for the sunburn incident was pretextual. The August 4 letter states that Smith's "failure to note [the sunburn] within [the patient's] medical records resulted in his being placed in the whirlpool." The ALJ found, however, that Smith, despite making incomplete treatment records, personally informed Starbuck, the -31- 31 overnight charge nurse, about the resident's sunburn.18 And Starbuck, in turn, told Conklin, the charge nurse who came on duty in the morning. It was on Conklin's watch that nursing assistant Sargent allowed the sunburned resident to get into the hot bath. The employer does not challenge these findings of fact. It is clear that either Conklin or Sargent -- and not Smith -- was to blame for the resident's being allowed to get into the whirlpool. This fault is at least equal to Smith's fault. But only Smith was disciplined for the sunburn incident. While the employer was undoubtedly justified in disciplining her for her role in the incident, the employer has failed to explain why no one else was disciplined too. This disparate treatment is telling. See Wyman-Gordon, 654 ___ ____________ F.2d at 141.19 Like us, the Board viewed this as a disparate treatment case, but the Board also relied on the fact that  ____________________ 18. Smith also made a notation in the "24-hour notebook," the notebook in which nurses at Agape House communicate with each other across shifts. The August 4 letter is somewhat disingenuous, then, in stating that Smith "failed to properly act, both in terms of record keeping and in terms of making recommendations to the nurse assuming duty after [her] shift." 19. Additionally, a few weeks after Smith's dismissal another nurse at Agape House was reprimanded, but not fired, for applying Silvadene to a sunburned resident without a prescription. This too is reflective of disparate treatment. However, a year before Smith's discharge, a nurse was fired ___ for the more serious offense of giving a seizure medication to a resident without a prescription. -32- 32 the employees responsible for the four other deficiencies cited by the state investigators were not disciplined by Yesterday's Children. The employer has convincingly argued that these other deficiencies were systemic problems for which no individual employees were at fault. Our focus, consequently, is on the other employees responsible for the sunburn incident. While our disparate treatment analysis differs somewhat from the Board's, we think that the Board's ultimate conclusion of pretext is a reasonable one. Because we conclude that there is substantial evidence in the record to support the Board's inference that the employer's discipline of Smith for both the choking incident and the sunburn incident was pretextual, the Board's Smith order is enforced. For reasons discussed above, the ________ Board's Cunningham order is vacated and her case is remanded ________ to the Board for further consideration. -33- 33